IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

FILED
IN OPEN COURT

SEP 2 5 2023

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

Newport News Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CRIMINAL NO. 4:23-cr-21 |
| | ) |
| OBINNA NWAFOR, | ) |
| | ) |
| Defendant. | ) |

## STATEMENT OF FACTS

By signing below, the parties stipulate that the following facts are true and correct, and that had the matter gone to trial, the United States of America would have proven them beyond a reasonable doubt, by competent and admissible evidence.

### Background

1. The United States Small Business Administration (SBA) is an executive-branch agency of the United States government that provides support to entrepreneurs and small businesses. The mission of the SBA is to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

2. As part of this effort, the SBA enables and provides for loans through banks, credit unions, and other lenders. These loans have government-backed guarantees. In addition to traditional SBA funding programs, the CARES Act, which was signed into law in March 2020, established several new temporary programs and provided for the expansion of others to address the COVID-19 pandemic.

3. The CARES Act expanded the SBA's long-standing Economic Injury Disaster Loan Program (EIDL) to provide for loan assistance (including $10,000.00 advances) for small

businesses and other eligible entities for loans up to $2 million. The EIDL proceeds could be used to pay fixed debts, payroll, accounts payable, and other bills that could have been paid had the disaster not occurred. Such loan proceeds, however, were not intended to replace lost sales or profits or for expansion of the business.

4.      Unlike certain other types of SBA-guaranteed loans, EIDL funds were issued directly from the United States Treasury, and applicants applied through the SBA via an online portal and application. The EIDL application process, which used certain outside contractors for system support, collected information concerning the business itself, such as gross revenues and the cost of goods sold for the business prior to January 31, 2020. The application also collected certain personally identifiable information (PII) of the business owner, including the business owner's full legal name, social security number, address, and telephone number. Prior to submitting an EIDL application, the applicant was required to electronically certify that the information provided was accurate and was warned that any false statement or misrepresentation to the SBA or any misapplication of loan proceeds could result in sanctions, including criminal penalties.

5.      Once the SBA authorized a loan under the EIDL program, the applicant was required to take certain steps before the loan proceeds were disbursed. Among other actions, the applicant was required to confirm the information for the bank account into which the loan proceeds were to be deposited, to include the bank name, routing number, account type, and account number. In addition, the applicant was required to sign SBA-generated loan documents that set forth the terms and conditions of the loan. Those documents includes a Loan Authorization and Agreement, a Note, and a Security Agreement.

6. For EIDL loans greater than $25,000, the Loan Authorization and Agreement required the applicant (referred to as the "Borrower" in the loan documents) to grant the SBA a continuing security interest in any and all "Collateral," which was defined in the Loan Authorization and Agreement as "all tangible and intangible personal property." In other words, loans in excess of $25,000 funded under the EIDL program were expressly conditioned upon the loan being secured by the borrower's personal property.

7. The Security Agreement, in turn, formalized the security interest granted by the borrower to the SBA. Among other things, the Security Agreement expressly contemplated that the SBA would take steps to "perfect" its security interest. Specifically, the Security Agreement provided that the Borrower consented to the "filing or recording or any documents necessary to perfect . . . [the] security interest."

8. The general rule in the Commonwealth of Virginia, subject to certain statutory exceptions, is that a security interest is perfected by the filing of a Uniform Commercial Code (UCC) financing statement. The State Corporation Commission's Clerk's Office, located in Richmond, Virginia, is designated as the central filing office for UCC documents, and UCC financing statements may be filed with that office online through the Clerk's Information System or by mail.

9. From in or about at least June 2020, through in or about at least November 2020, in the Eastern District of Virginia and elsewhere, the defendant, and others working in concert with him sought to fraudulently obtain—and successfully obtained—disaster-related benefits in the form of several EIDL loans. Specifically, as set forth below, the defendant and others procured loans from the EIDL program using stolen identities and directed the SBA to disburse the proceeds

of those loans into accounts controlled by the defendant, so that the defendant and others working with him could convert the loan proceeds for their own use and benefit.

10.     In or about September 2020, L H., a resident of Norfolk, Virginia, learned and advised investigators that an EIDL loan had been fraudulently obtained in her name when she received a statement from the SBA at her home address via the U.S. mails, advising her that the first payment on an EIDL loan obtained in her name was due in August 2021. L.H. had not applied for a loan under the EIDL program, nor did she own a small business to be eligible for such a loan.

11.     On August 4, 2020, an application for an EIDL loan in the amount of $150,000 was submitted to the SBA, using L.H.'s name, social security number, address, phone number, and date of birth—all of which did, in fact, belong to L.H. A Loan Authorization and Agreement, Note, and Security Agreement were electronically signed using L.H.'s name on August 4, 2020. Thereafter, loan proceeds in the amount of $149,900 were disbursed to an HSBC bank account ending in 6096 on August 6, 2020. L.H. did not use HSBC for banking needs and did not receive any of the money from the loan.

12.     On August 15, 2020, shortly after the L.H. EIDL loan was funded, Corporation Service Company, a third-party provider of UCC filing services, electronically filed a UCC financing statement with the Virginia State Corporation Commission, which listed L.H. as the "debtor," and the SBA as the "secured party." In addition, the financing statement included the SBA loan number assigned to the loan that was obtained using L.H.'s information.

13.     Further investigation revealed a number of related EIDL loans that had been fraudulently obtained. An application for one such loan was submitted to the SBA on or about July 8, 2020, using the business name "Kerrido G. Farms" and the personal information of K.G.,

4

a resident of Burke, Virginia, who was identified as the business owner. The application sought an EIDL loan in the amount of $150,000.

14. The name, date of birth, social security number, and address used on the loan application were correct and belonged to K.G., but K.G. did not apply for the loan, nor did K.G. authorize anyone to obtain a loan on K.G.'s behalf. In addition, K.G. does not own or work at a business named "Kerrido G. Farms."

15. A Loan Authorization and Agreement, Note, and Security Agreement were electronically signed using K.G.'s name on July 11, 2020, and EIDL loan proceeds in the amount of $149,900 subsequently were deposited into a Citibank bank account ending in 9505 on July 14, 2020.

16. On July 21, 2020, Corporation Service Company electronically filed a UCC financing statement with the Virginia State Corporation Commission, listing K.G. as the "debtor," and the SBA as the "secured party." The financing statement includes the SBA loan number assigned to the loan that was obtained using K.G.'s information. K.G. did not receive any of the money from the loan and was unaware of the loan and the financing statement.

17. The investigation further revealed that both the HSBC bank account ending in 6096 (the account in which the funds from the L.H. loan were deposited) and the Citibank bank account ending in 9505 (the account in which the funds from the K.G. loan were deposited) are accounts associated with and controlled by the defendant. Specifically, the HSBC checking account ending in 6096 is a business account for the entity Obeva Global Inc. ("Obeva"), of which the defendant is the president and registered agent, according to bank records and documentation from the New York Department of State. The Citibank bank account is also in the name of Obeva Global Inc.

5

The defendant was the signatory on both HSBC and Citibank accounts. Both HSBC and Citibank are financial institutions as defined under 18 U.S.C. § 20.

18. Within just days after the loan proceeds from the aforementioned EIDL loans were deposited into the defendant's HSBC bank account ending in 6096 and the Citibank bank account ending in 9505, a number of large withdrawals and transfers were made from those accounts.

19. Notably, with respect to the fraudulent L.H. loan proceeds, the defendant transferred approximately $59,000 from the HSBC account to a Bank of America held jointly by the defendant and his spouse. In addition, the defendant transferred nearly $50,000 to a bank account held in the name of a Nigerian entity in which the defendant holds an interest. The defendant also transferred nearly $75,000 to an account belonging to J.A., a resident of New York.[1] Nearly all of the funds were transferred or expended between August 5-12, 2020.

20. Similarly, with respect to the fraudulent K.G. loan proceeds, within days after the EIDL loan proceeds were deposited into the Citibank bank account ending in 9505, the defendant transferred $45,600 to the same Bank of America account referenced above and transferred nearly $40,000 to the same bank account of the Nigerian entity referenced above. Nearly all of the funds were transferred or otherwise expended between July 14-16, 2020.

21. Specifically, as to one such transaction involving the L.H. loan proceeds, on or about August 10, 2020, in the Eastern District of Virginia and elsewhere, the defendant, aided and abetted by others, did knowingly engage in the following monetary transaction, by, through and to a financial institution, affecting interstate commerce, in criminally derived property of a value

---

[1] J.A. advised investigators that she was involved in an internet relationship from a dating site with someone known as D.B. J.A. was asked by D.B. to accept a large money transfer from a friend of D.B., which D.B. could not access due to being on an oil rig. J.A. was told the funds were business income from an oil business and instructed to do some sort of crypto currency purchase with the funds.

6

greater than $10,000—that is, a monetary deposit that represented fraudulently obtained loan proceeds—such property having been derived from a specified unlawful activity, that is, Mail Fraud, in violation of 18 U.S.C. § 1341: A $35,780 wire transfer from the Obeva checking account at HSBC ending in 6096 to the defendant's joint checking account with his wife, V.E., ending in 6157 at Bank of America. These transferred funds represented a portion of the $149,900 in proceeds from the L.H. EIDL loan, which had been deposited into Obeva's account around four days prior to this transaction.

22.    After the defendant was arrested on these charges on April 11, 2023, he was advised of his rights under *Miranda* and agreed to speak with law enforcement. During the recorded interview that following, the defendant admitted that he used to own and operate Obeva, that he was the only employee of that corporation, that Obeva previously had a bank account with HSBC, and that he was the only person who had access to Obeva's bank accounts. The defendant also stated that he is married to V.E.

23.    Prior to his involvement with the fraudulent loans of L.H and K.G., from in or about May 2020 through in or about October 2020, the defendant received approximately $300,000 in pandemic-related unemployment benefits in the names of other individuals into approximately six different bank accounts that the defendant owned and controlled. These deposits included some $58,176 into the aforementioned Citibank account (June 4-12, 2020); some $26,142 into the aforementioned HSBC account (July 15-21, 2020); and some $152,520 into a Wells Fargo account (last four digits 1102) from May 21, 2020, through June 23, 2020.

24.    The defendant was contacted by Wells Fargo Bank with respect to these deposits of unemployment funds that were not in the defendant's name. The defendant was advised that these funds would have to be returned to an unemployment office. The defendant recorded two

7

conversations regarding the unemployment funds and sent these messages (via his cell phone) to another individual.

25.     Included in a text chain with this other individual was a July 20, 2020, message in which the other individual advised the defendant: "We will discuss on this transaction, and see the way forward, I can't tell the guys their money is gone just like that without proof of wellsfargo saying they will not pay you[.]" Four minutes later, the other individual sent another message that read: "What of the 9ja for today's payment, where you able to reach or is everything ok with their branch? , the guys I collected their money has been calling since 3am because I told them once bank start working in Nigeria I will pay them, arrange 7m for me to pay the one on my neck while we wait for your contact to clear up, I am in big trouble now please[.]" Following these messages from the other individual, the defendant sent two recorded conversations from Wells Fargo regarding the unemployment funds. Additional messages between the defendant an the other individual followed about putting money into an account. These exchanges occurred prior to the defendant's receipt of the L.H. EIDL loan proceeds.

*     *     *

26.     The defendant stipulates and agrees that he committed the acts described herein unlawfully, knowingly, and willfully, and without legal justification or excuse with the specific intent to do that which the law forbids, and not by mistake, accident, or any other reason. The defendant further acknowledges that the foregoing statement of facts does not describe all of his conduct relating to the offenses charged in this case, nor does it identify all of the persons with whom he may have engaged in illegal activities.

Respectfully Submitted,

Jessica D. Aber
United States Attorney

By: ______________________
Brian J. Samuels
Assistant United States Attorney
Alyson C. Yates
Special Assistant United States Attorney

After consulting with my attorney, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States could prove these facts beyond a reasonable doubt.

______________________
OBINNA NWAFOR
Defendant

I am counsel for OBINNA NWAFOR. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

______________________
Paul G. Gill
Joseph Camden
Defense Counsel